Let's wait just a minute. Okay, Mr. Fagan. Thank you. Good morning, Your Honors. This is a case that the temporary insurance agreement cannot be viewed in a vacuum because Ameritas, as a life insurance company in Louisiana, has to comply with Louisiana law in connection with its forms, its policies, its substantive provisions. And in the absence of those provisions, Louisiana law is going to be incorporated into the agreements. That's important here because the TIA, Temporary Insurance Agreement, conformed with Louisiana law. And actually it went a step beyond it. Louisiana law would require somebody like Russell Thomas to obtain an insurance policy on the life of his adult son to get that son, Deshaun Murphy, to sign the application. And Louisiana law also allows consent to be expressed. But it has to be done in either case to effectuate the policy. That's the only way the policy can be issued. So the TIA and the application itself for that and the documents are narrower and there is a right to do that contractually. There's freedom of contract. It shouldn't be more onerous for the insurer to do that. So here, that's exactly what the policy said. And that's where things fell apart here. Because even Mr. Johnny Alford, the agent, in the trial judge's decision recognizes that he understood that you needed to be a major. That's why he testified that he believed that you needed to have someone, that Deshaun needed to sign the contract. That's why the trial judge concluded in one of the many ways that she found Mr. Alford's testimony not to be credible, that he had to say that because he realized that he hadn't done that. And so to circumvent that and appear like he had complied with the law, he said, well, I knew that I needed to have Deshaun sign because he was a major. There was some inconsistency in the evidence, too, as to where everything was signed, right? Whether it was the office of the House. There was inconsistencies as to, I think the trial judge accepted that there were two meetings. That there was a first meeting at the House that was the exploratory and that Deshaun Murphy, his mother, was there and so was Mr. Thomas. And then the second meeting is at the office of where the forms were completed and filled out with Mr. Thomas and Mr. Alford. I think that's the way that the trial judge's conclusion and findings of fact came out. And I think there's evidence to support that. That's what she supported that. There's not an absence of evidence to support that. But in either case, everybody agrees, except for Mr. Alford, that Deshaun was not there and the trial judge rejected Mr. Alford's testimony. So here we have the fundamental principle of Louisiana law is that if you make an offer, the acceptance has to be one with mutual consent meeting of the minds. That is lacking here because what was presented to Emeritus was an application by somebody who didn't sign the application. That's a fundamental flaw. There was no way for there to be a meeting of the minds. And that's something that Emeritus pled in our . . . The district court, as I read it, recognized that that was a problem but just said the fault lies on the agent and the agent, that flows to the insurance company because the agent was the one who directed the falsities on the form, including I think the signature. They were all electronically signed. What the trial judge found and what the testimony said was that Mr. Alford was allowed the opportunity to review the application but decided not to do so for the same reasons that you referenced. He was relying on Mr. Alford being an agent for that. But that begs the question, and here the juxtaposition is estoppel, essentially, or vicarious liability versus the positive law and what the positive law says. The only case that we found, that I found, that stands for the position that you can just disregard the positive law is the Adam McGehee's funeral home case from 1970 by the Third Circuit. And frankly, for the life of me, I can't figure that one out, why they would just decide that that's something that's not a public interest because . . . Well, of course, the facts there anyway were pretty unusual because the insured was . . . Sure, in jail. . . was incarcerated, yeah. And besides, Louisiana doesn't really, you know, recognize stare decisis in that way, so . . . Right. . . One intermediate court opinion that's from 50 years ago doesn't override the plain meaning of the statute. Thank you. I would submit there's a consistent body of jurisprudence in the state, both in state courts and federal district courts here, that goes the other way. So it can be found at that the positive law cannot be displaced by estoppel. And that's the fundamental principle here because it would render the statutory provision meaningless. And statutes have to be given meaning. And for instance, you have the only time that you can rely on equity, which is what is going on when you say I'm relying on the mistakes of the agent here, Mr. Alfred. That's equity. It's not contract. It's equity. And Louisiana fundamentally only allows equity when there's no legislation. Article 4 of the Louisiana Civil Code. Article 7 says you can't derogate from statutes that are enacted in the public interest. We cited, in our brief, the fundamental premises, the foundation, the building stones, if you will. The Louisiana Insurance Code, unsurprisingly, regulates insurance. And it defines how it does so in the provisions that the Louisiana Insurance Code includes. Well, there's, of course, there's the overriding public interest in the whole insurable interest concept. If you allow estoppel this way, then some rogue insurance company could come into the state and start issuing policies on public officials or movie stars or athletes or whoever, and it would completely undermine the insurable interest. I just don't understand the whole estoppel theory here. Well, and I think the flip side of that, Judge Smith, is that the legislature in Louisiana decided that there were two ways where you didn't need the insurance consent. Number one, if it's a minor, and that makes perfect sense under Louisiana law because the Louisiana Civil Code allows parents, generally speaking, unless there's divorce or something like that, but they're always going to allow some adult or parent or representative to act on behalf of the minor. The other instance, and it's very narrow, very limited, is the spouse. In those two instances only is the requirement for an insured to sign the application or consent thereto is what it says, but not something that can be avoided. Otherwise, it has, and that's what we have here. We have a major son who came, who had no idea in the testimony, everybody agreed, Deshaun had no idea what was going on. He wasn't in the room except according to Mr. Alford, and the trial judge correctly rejected that, and so you have a circumstance where you have a policy that the testimony by the emeritus representative says we would never have issued this policy had we known the truth, and the truth is that the statute itself says that it is void. If you can't write a policy that has, that ensures the life of another unless the insured signs the application or consents thereto, and there's just no evidence there. Now, what do we do with the lack of the medical records, the medical history? Pardon me? What do we do with the failure to provide the medical history? Wasn't that a requirement? There were, Your Honor, and those to me, frankly, I think that unless the court finds that there was some skewing of the trial court's view of the law, which I think there was because basically the trial judge said anything and everything that this agent did that was a mistake is imputable to emeritus. There were many credibility calls about who she believed, and I don't think that those credibility calls about who said what are things that per se can be reviewed, but there are some fundamental things that there were omissions that would have been a material to emeritus had they been disclosed, and those were in the testimony of Robin Waller, who indicated when and under what circumstances. So, and there, I think as the panel knows from the briefs, there is a plethora of things that were not disclosed about this young man's prior medical history at all, and that falls back, and the trial judge fell back on the syllogism. Well, if it was, I just didn't believe Johnny Alford. I think that that information was told to Johnny Alford or it's inconsequential, but from emeritus' point of view, it was not. These were all material facts. There were so many things that were omitted and so many things that were not true that that would have borne on the wrist, obviously. Going back to your consent argument, I saw the district court didn't cite that Louisiana statute 22-856. Did you raise it below? I mean, I know the general issue of consent I saw was raised below in terms of there's no valid contract without consent, but did you argue it was a statutory violation below? Not expressly. The Adam McGez Funeral Home case was cited and discussed before the district court. It did include that discussion on that statute, and that's where, you know, where it was raised before. So I think the issue was before the district court in that sense, and the district court basically relied on Adam McGez, and again, it fell in with the, yeah, Adam McGez Funeral Home, and again, fell in line with, well, follow that case, you can stop it. But you didn't say finding insurance contract here would violate 22-856? Not expressly, no. And that is, I think, because that's a pure question of law and this is something that even if the court finds that it's something we should have raised, I mean, we, in every pleading virtually that we filed, we hammered on the absence of consent, and I would submit that the court should address 22-856 because it's precisely consistent with the application itself. I mean, the PIA conforms with that statute and its requirements. So this court can consider things even though they were not expressly briefed below. I mean, the issue was considered, it just wasn't expressly briefed in that sense, and the court followed the Adam McGez case, which the Third Circuit rejected any notion that just because they didn't comply with the statute that that didn't preclude the estoppel doctrine from applying. There were other policies taken out on this same person, right? There were other, I believe there were. What I'm about to ask you is what does the record in this case, if it does, and if it doesn't, just say it doesn't say so, what does the record in this case tell us about what happened to those other policies? Were they paid or what happened? Well, I don't think anybody else died. Any of the other children died, so I'm unaware whether they paid. I think the fact that there were other policies applied for was definitely presented during the testimony. What I don't recall, and I'm sorry, I meant to review the complete record yesterday. We had a little power outage downtown that kept me from pretty much accessing anything, but I don't believe any of the other applications were submitted. I think it was referred to only in general. But I think that the other part that we did for the vicarious imputation or liability, I mean, Louisiana law does require under Article 2320 of the Civil Code that there has to be some showing about how emeritus might have prevented the act that caused the damage and have not done it. I don't know how you could have prevented something like this from happening, and insurance companies should be allowed to rely on submissions made by their agents who are qualified to be brokering and soliciting insurance in the state of Louisiana, and that's exactly what they did. There was no signs, no portents that something was amiss here. And there was only 18 days later. I mean, emeritus had started to investigate the policy issues. They may have discovered it if Deshaun had not passed away 18 days later. So I see my initial time is up. Thank you. You saved time for both, Mr. Yes, I did, Your Honor. I think I did. I should have. Five minutes. Five minutes. That's right. Yes. Mr. Curtis? May it please the court, counsel. Tracy Curtis on behalf of plaintiff Russell Thomas. I'm trying to address some of the questions that y'all asked defense counsel. Honorable Smith, he asked about the record, what it said about the other policies, whether they paid or not. Are you talking about the white, the mother's policy? The mother had policies on Deshaun. Is that what you're talking about? Are you talking about the other policies? I'm just talking about the policies on Deshaun. Yeah. So Deshaun's mother had policies on Deshaun. Yeah, it's not in the record. That didn't come up. And I didn't know if you meant, though, the other policies, because emeritus didn't just sell this policy for Deshaun. Two other adult children of plaintiffs were also written. Asia, AYSIA, and Nicholas. And those policies in the record were issued, not just the TIA, but the policies. So we have those. I didn't know if that's what you meant. Judge Smith, you also asked about some inconsistency on the signing of the TIA or the application. I thought there was some confusion stated by the agent about maybe at one point maybe he said it was signed at the house and the other time he might have said it was signed at the office. Okay. But if I'm misunderstanding the record, that's why I'm asking you to correct me. Right. And I just wanted to make sure. So that was the, Mr. Alford's the only one who I think vacillated on that. He's not credible. Uniformly, though, the evidence is that the signatures were all by computer, electronic signatures. But Deshaun never signed anything, right? No, Your Honor, he didn't. Well, he didn't, but did anyone? Did anyone sign anything? Well, Thomas was there. He was there. And presumably would have given his permission. I mean, assume that, right? But Deshaun's not there and he's the insurer. Doesn't he have to sign the contract? He, well, again, according to the evidence and what Emeritus, the way they operate, allowing agents to use electronic signatures, then yes, he did sign it. I think that's arguable. Did he give consent? No. But who was in the position to avoid this is Emeritus. Well, absolutely. That may be the better question. He never gave consent, either flat or otherwise, right? I'm sorry? He never gave consent, either implied or otherwise. Well, the record is that he did not sign anything. He wasn't at the meetings and his father did not discuss it with him. So those are all true. Doesn't that take us out of this Adam McGez case? McGez was basically when the agent said, you can sign for him, that's fine. And the signature was done and taken care of. And that turned out to be wrong under Louisiana law. And there the court held it against the insurance company, right? Yes. This case seems to be beyond that because here you didn't have anybody signing for Deshawn or anything, I mean, other than the agent. Correct. And only the agent was the one who knew the importance of Deshawn's signature. There's no evidence, although the defendant argued that. Does that matter? I'm sorry? Yes, I think it, yes, absolutely. That's the insurance company telling these applicants that we don't need Deshawn. It, again, who, how could this all have been avoided? Had Emeritus marshaled its agents better? Part of the reason, okay, 22-856 was never raised, ever raised until appeal, Your Honor. Judge Smith, you asked about, no, Judge Costa, you asked about that. Why? At trial, it appeared to me that Emeritus was ignorant of the depth of Mr. Alfred's deception. And so I think until then, they had no idea that 856 might even apply, that it was not raised at trial. It was not raised in pleading, ever. So it wasn't even, that objection wasn't even secured or raised for an appealable error. But it all, Your Honors, comes to us, to the plaintiff is, you have the agent who the applicants, by law, are allowed to rely upon. We have the law that the bad actions of an agent, an insurer's agent, cannot be used to bar recovery. That's the Cloud case. In Cloud, Cloud is the case where the agent says, sign here. And the applicant signed it, back in the days with ink, right? So he signed it. So, and that's what the Cloud court says that anything in there that you can't use what's in this to bar recovery. And that's, not only is that correct and fair and just, it's equitable, but there is another angle. Emeritus can go after Johnny Alfred. That's in the case of TOOPS. You know, when it's in TOOPS, when if your agent is, provides false information or perpetrated fraud, you can go after him. So Emeritus still has redress against its own agent. And I really do think that it does boil down to the 856. We, so you know, preparing for oral argument and doing briefs, I'm always horrified by my brief. Because I've seen three or four mistakes here, grammatical. And then also, we, both sides talked a lot about pleading this and pleading that. I think we both violated that. So it really does, I think, come down to 856. The statute doesn't say that it's void. The statute actually talks about application. It says it must be a written application. Yes, it says it needs to be signed by a major child. But it also just talks about application. The written application, it must be a written application. So we have that electronically. The insurable interest, we have that. And so the question, yes, then our argument as plaintiff is, if this honorable court is going to reckon with or apply or rule based on 856, which you feel it should not because it wasn't raised before. But if it does, then the appropriate thing is to hold the merits house accountable for its agent. And what its agent did. And that's really the long and the short of it. As far as if you have any questions about the interest, I know that, you know, defendant, appellant says that they shouldn't be required to pay interest because they were justified in their denial of the claim and their failure to respond within 60 days. Again, they really don't think they had any clue how, what Mr. Alfred had done until the trial started. But they did do a little investigation. They had that man go out and talk to him and they could see then something was fishy. But they, it was them, I mean, they just didn't go further and find out really what Mr. Alfred had done. So it wasn't justified. It all goes back to Mr. Alfred's unclean hands and therefore Emeritus's unclean hands. Also, the statute isn't a penalty. It doesn't say it's punitive. It doesn't say as a penalty, you shall pay. But it's what's required. I'm sorry, Your Honor. It's what's required. It says shall. If, if, yeah, I'm sorry. This Mississippi lawyer with Louisiana law. Yeah. You're a, you're a positive law state. So you've got this statute. I mean, how much reliance do we put on the statute alone versus this Adam Magez case versus Estoppo, these equitable considerations? I mean, the statute's paramount, isn't it? The statute? Yeah, it's very important. Shouldn't we just apply the statute and move on? There was no consent given. Are we talking about 856 or the penalty? Yes, yes. But I want you to kind of explain to me the interplay in Louisiana law of how we're supposed to analyze this. Yes. Assume no waivers. Theoretically, Your Honor, the statute is, is prime. But we have libraries full of the cases and the books that change that. But as far as, I mean, the statutes have to be read together. So that's why we say with the insurable interest, it's clear that it's a blood relationship. That's 22901. Close relation, closely related by blood or closely related by affection. The statute for the penalties is 221811, and it says you have 60 days to reject. And if you don't, 60, excuse me, you shall pay a penalty, not a penalty, excuse me, shall bear interest at 8%. And my point with that is it's not punitive. Other statutes we have for, like, 967 that, with the auto adjusting claims, actually use the word penalty, you know, in their statute. This one doesn't. In my view, I don't have authority for this, but it's not a penalty. It's equitable. Essentially saying, hey, if you take more than 60 days, you're going to pay 8% interest, you know, until you make up your decision to pay the claim. So it just, it's not a penalty. It's, okay, it's not a penalty. In this case, maybe, maybe emeritus feels like it is because we've gone several years now without any payment. So interest may be substantial, but the statute is written, I feel, is more equitable. Just saying, look, you have 60 days. If you take longer than 60 days, then you also need to pay the 8%. I have nothing further. I could talk, but I don't want to take your time. It's valuable. However, if you have any questions, or if I failed, Judge Wilson, in particular, to satisfy your question, any of yours, but I'm happy to answer that. All right. Thank you, Mr. Kirby. Thank you. It's been an honor to be before your honors. I guess you've never heard that before, huh? Thank you. Okay, Mr. Fagan, your rebuttal. Very briefly. So my opposing counsel asked how could this be avoided, and Mr. Alfred gave Mr. Thomas the opportunity to take a look at the application documents before submitting them, and had he bothered to look at that, which was incumbent upon him to do a submit. He could have seen that this is all these references to Deshawn, and Deshawn wasn't there, and everybody knew that, and so that's one answer to the question. I want to be more specific, Judge Costa. The Adam Magez case was cited by the plaintiff in opposition to the motion for summary judgment that Emeritus filed, and that site can be found at Record ROA 713. Then Emeritus referred to that decision in its reply on the same subject at Record ROA 753. So as I said, and that was, as you know, the Adam Magez case actually dealt with the predecessor statute, so it was 22613 and 22616, but they're the same, and one thing I did want to mention and to emphasize the point about the insurable interest. It's hard to figure this out, but I believe that the 1995 amendments to 22901, the predecessor to that, actually put the reference to 856 in the statute as part of what is an insurable interest, and then if you look at 856 itself to Judge Smith's point, it actually refers to insurable interest in the context of a minor child, and that's when you do not have to have an application. And I also, what's being requested, I think, by the appellate is exactly what the Louisiana Supreme Court says should not be done, which is disregard public policy decisions underlying legislation or to reweigh balances of interest and policy considerations already struck by the legislature. The legislature has made, and that's the Travelers versus Joseph case that's cited in our brief, the legislature here made the decision. They decided what was the bar and what was the threshold and what was the prerequisite for anyone to apply for insurance on the life of another, and they said the only time that you're going to have to get the insurer to sign that is if it's somebody who's a minor or your spouse, and that's it. And that's why this whole House falls apart here, because the court should not uphold, and it would be a miscarriage of justice to uphold a policy that would be in contravention of Louisiana law. In a world of electronic signatures, I'm curious, how does, I mean, someone makes a file and they see electronic signatures, how does your company even know to suspect that the person being insured didn't sign it? They don't, there's no way of doing that from the electronic record itself, if that's what you're asking. That can't, any more than you could look at a- It's just in the course of an investigation into the claim, they discover that. It was, yes, it was later that that was figured out. Judge Costa, you couldn't figure that out any more than whether somebody had actually forged a signature on a hard copy either. It's the same, you don't discover that sort of thing usually on its face. So, unless the panel has any further questions, I thank you for your time. Thank you, Mr. Spagan. The case and all of today's cases are under submission and the court is in recess under the usual order.